IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **KATHRYN POLLARD,** | : | Case No. C2-11-CV-0286 |
| | : | |
| Plaintiff, | : | JUDGE ALGENON L. MARBLEY |
| | : | |
| v. | : | Magistrate Judge Preston Deavers |
| | : | |
| **THE CITY OF COLUMBUS, OHIO,** *et al.*, | : | |
| | : | |
| Defendants. | : | |

## OPINION & ORDER

### I. INTRODUCTION

This matter is before the Court on Defendants' Motion for Summary Judgment (the "Motion"). (Doc. 33) Plaintiff, Kathryn Pollard, brings this suit to recover for alleged violations of the Constitution and Ohio law related to the killing of her son, Abram Bynum, by officers of the Columbus Police Department (CPD). Defendants move to dismiss Plaintiff's Complaint (Doc. 2) in its entirety. For the reasons set forth herein, the Motion is **GRANTED IN PART** and **DENIED IN PART**.

### II. BACKGROUND

On June 29, 2009, the Los Angeles County Sheriff's Department (the "LASD") contacted Sgt. Terry McConnell of the Columbus Police Department ("CPD") to request that McConnell obtain a DNA sample from Abram Bynum, a suspect in a series of sexual assaults in California which occurred from 2004 to 2007. At the time McConnell received the request, Abram Bynum resided in Columbus, Ohio with his identical twin brother, Aaron Bynum. On the evening of June 29, CPD officers found Abram Bynum at Aaron's house and Abram voluntarily submitted to a buccal swab, thus providing the officers with a sample of his DNA. On June 30, McConnell sent Abram Bynum's DNA samples to the LASD.

On July 6, the LASD Crime Lab matched Abram Bynum's DNA profile with DNA obtained in five rape cases. Later that day, the Los Angeles Superior Court indicted Abram Bynum on 19 felony counts, including four counts of forcible rape and one count of assault with a deadly weapon. LASD informed McConnell of the indictment and asked that CPD maintain surveillance of Abram Bynum until LASD officers arrived in Columbus the next day, July 7, to arrest Abram Bynum. On the morning of July 7, CPD detailed Defendant Detective Michael Yinger of CPD's Strategic Response Bureau ("SRB") to conduct the surveillance and informed him of the particulars of Abram Bynum's indictment. Yinger enlisted the assistance of other SRB members and the FBI's Violent Crimes Task Force in maintaining surveillance.

The joint force quickly arrived at Aaron Bynum's residence, shared with Abram Bynum, located at 3574 E. Main St. in Columbus. Officers in unmarked vehicles successfully followed the Bynum twins throughout the day of July 7 as, together, they ran errands to a worksite, Wal-Mart, and a pawnshop. The brothers returned to the house at approximately 3:35 p.m. At that time Defendant Yinger and a member of the FBI task force contacted McConnell to ask what they should do if the brothers left Aaron Bynum's residence again. At that moment McConnell was en route to the airport to meet LASD officers coming to arrest Abram Bynum. McConnell instructed the surveillance team to detain the brothers and arrest Abram Bynum if they attempted to leave.

As Yinger finished the call with McConnell and returned to his car, Aaron and Abram Bynum emerged from the residence and proceeded to enter different cars. The surveillance team was not yet in position to execute McConnell's new instructions to detain the brothers. Instead, some members followed Aaron Bynum's vehicle, while others followed Abram Bynum's vehicle. Abram Bynum was driving his own vehicle, a white Cadillac. Four unmarked police

2

vehicles, including one driven by Defendant Yinger and one driven by Defendant O'Donnell, followed Abram Bynum's white Cadillac.  Defendant O'Donnell aired a request for the assistance of marked police cruisers in the area to stop Abram Bynum.  Cruiser #91, driven by Defendant Amstutz, responded and joined the pursuit.  Defendant Amstutz signaled for Abram Bynum to pull over by activating his vehicle's lights and siren.  (*Cruiser #91 Video Recording*, Doc. 34, Exh. B at 15:50:41.)  Instead, Abram Bynum accelerated and proceeded to run five stop signs.  (*Id*. at 15:51:11.)  After Amstutz had pursued Abram Bynum for approximately one minute, his supervisor, Sergeant Worthington, cancelled the pursuit.  At that time, Worthington was not yet aware of the charges against Abram Bynum, but Worthington did instruct Amstutz to keep Abram Bynum's vehicle in sight while a police helicopter continued to follow Bynum.  (*Channel 2 Radio*, Doc. 34, Exh. A at 15:52:14.)  The unmarked police vehicles that had followed Abram Bynum from the beginning also maintained pursuit.  One police officer also attempted to stop Abram Bynum's vehicle with spiked sticks, but was unsuccessful.

     At approximately 3:55 p.m. Abram Bynum entered I-70 East, with both unmarked cars and a helicopter still pursuing him.  He was driving at excessive speeds and weaving through traffic.  At 3:58 p.m., after learning from Sergeant McConnell that Abram Bynum was a rape suspect, Sergeant Worthington again authorized cruisers to pursue.  (*Id*. at 15:57:48.)  Defendant Estepp and his partner, Officer Kinney, were in Cruiser #144 roughly one-half mile behind Abram Bynum at the time pursuit was reauthorized.  They began to pursue Abram Bynum, also engaging their emergency lights and sirens.  (*Estepp Affidavit*, Doc. 33 at Exh. I.)  Amstutz also rejoined the pursuit, roughly one-half mile behind Cruiser #144.  (Doc. 34, Exh. B at 15:57:40.)  Seconds later, Abram Bynum crossed the median and began driving eastbound in the westbound lanes of I-70.  (Doc. 34, Exh. A at 15:57:48.)  Abram Bynum's Cadillac narrowly missed hitting

3

one vehicle and then did collide, head-to-head, with a semi-truck. (Doc. 34, Exh. B at 15:58:58.) The Cadillac spun before coming to a stop on the inside shoulder of the westbound lanes. It appeared severely damaged. The front-end had been directly impacted and the hood jammed at an upward incline, obscuring the view through the windshield.

The pursuing police vehicles stopped near the Cadillac and a number of officers approached it. Defendant Amstutz parked his cruiser roughly 25 meters from the Cadillac, facing the front of the Cadillac. The cruiser's dashboard camera recorded the following incident. At 3:59:22 p.m., a message on Channel 2 Radio informed the officers that Abram Bynum held a concealed carry weapon ("CCW") permit. (Doc. 34, Exh. B at 15:59:22.) That information was later discovered to be erroneous; only Aaron Bynum possessed a CCW permit. Amstutz approached the driver-side window, which had shattered, and radioed that Abram Bynum appeared to be unconscious. (*Id*. at 15:59:31.) The subsequent autopsy found that Abram Bynum had suffered a number of injuries as a result of the crash, including: a fractured clavicle; a fractured sternum; multiple rib fractures; and abrasions to the head. (*Autopsy Report*, Doc. 55, Exh. T at 1.) The video from Cruiser #91 shows that Defendant Estepp and Officer Kinney reached the white Cadillac seconds prior to Amstutz. (Doc. 34, Exh. B at 15:59:26.) Amstutz crossed to the opposite shoulder in order to check on the driver of the semi-truck. Kinney attempted to open the passenger door of the Cadillac and reached inside the vehicle. (*Id*. at 15:59:30.) Estepp attempted to open the driver-side door and also reached inside the vehicle. (*Id*.) At 15:59:37, Estepp and Kinney both appear to have their heads inside the vehicle, through the shattered windows, while attempting to open it. (*Id*. at 15:59:37.) At the same time, Defendants Yinger and O'Donnell approached the vehicle from the driver-side, stopping roughly ten feet distant. Defendant E. Edwards entered the frame of the cruiser video behind Yinger and

O'Donnell.  At 3:59:52 p.m., Abram Bynum apparently moved, in response to which the five officers around the Cadillac jumped and backed off the car.  (*Id*. at 15:59:52.)  Defendant Yinger stated, "[Bynum's movement] startles.  We're kind of jumping around, doing. . . then we're yelling, let's see your hands, let's see your hands." (*Yinger Deposition*, Doc. 33-16 at 17.) Although Defendants' accounts differ somewhat, they agree that more than one officer yelled some form of command for Abram Bynum to show his hands.  By 4:00:03 p.m., four officers (Kinney, Estepp, Yinger, and O'Donnell) stood in a rough semicircle approximately ten to fifteen feet from the Cadillac.  (Doc. 34, Exh. B at 16:00:03.)  At 4:00:05 p.m. three officers, Estepp, Yinger, and O'Donnell, began firing into the Cadillac.  Shooting stopped three seconds later.  Defendant Estepp stated that prior to firing he saw that Abram Bynum "appeared to be reaching for something on the floorboard of the car" before "[Abram Bynum] swung his hands toward the plain clothes officers." (*Estepp Affidavit*, Doc. 33-8 at 4.)  Defendant O'Donnell, however, stated that Abram Bynum twice appeared to be reaching "for something near the rear waistband of his pants" in addition to reaching for the floor.  (*O'Donnell Affidavit*, Doc. 33-5 at 6.)  He also stated that he saw Abram Bynum holding a "dark object." (*Id*.)  Although the details of Defendants' accounts differ, all state that Abram Bynum moved his arms in some way prior to the shooting.

When the first volley ended, Defendants E. Edwards, W. Edwards and Amstutz had arrived within approximately 20 feet of the driver-side of the Cadillac.  Defendant Amstutz had returned to the scene when he heard the first volley, stating that he did so "Because I didn't know what was going on at that time.  You know, I didn't know if anybody was hurt.  I didn't know who was shooting." (*Amstutz Deposition*, Doc. 33-13 at 6.)  Amstutz also stated that he saw Abram Bynum "with his right hand reaching down towards under his seat, towards his right leg,

5

and then bringing it up as if he had a – as if he had a weapon." (Doc. 33-13 at 7.) The second volley began at 4:00:20 p.m. with four officers, Defendants Yinger, Amstutz, E. Edwards, and W. Edwards, firing. (Doc. 34, Exh. B at 16:00:20.) No one attempted to communicate with Abram Bynum between the first and second volleys. (Doc. 33-13 at 7.) Defendant Yinger believes he was the first officer to open fire in both volleys. (Doc. 33-16 at 19-21.) Defendants O'Donnell and Estepp, whose positions remained unchanged during both volleys, did not fire in the second volley.

In total, Defendants fired 80 shots at Abram Bynum's car, 23 of which struck Abram Bynum. (Doc. 55, Exh. T at 9.) Abram Bynum died at the scene of the shooting. The doors of his vehicle could not be opened and had to be manually removed in order to extract his body.

Plaintiffs filed this suit against all six officers who fired at Abram Bynum, Estepp, Yinger, O'Donnell, Amstutz, E. Edwards, and W. Edwards. Plaintiffs also sued the City of Columbus. Defendants have moved for summary judgment for all Defendants on all claims. Plaintiffs oppose summary judgment. The Motion has been fully briefed. The Court heard oral argument on June 12, 2013.

### III.  LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides, in relevant part, that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." A fact is deemed material only if it "might affect the outcome of the lawsuit under the governing substantive law." *Wiley v. United States,* 20 F.3d 222, 224 (6th Cir. 1994) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, (1986)).

The nonmoving party must then present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.,* 8 F.3d 335, 339–40 (6th Cir. 1993). The suggestion of a mere possibility of a factual dispute is insufficient to defeat a movant's motion for summary judgment. *See Mitchell v. Toledo Hospital,* 964 F.2d 577, 582 (6th Cir. 1992) (citing *Gregg v. Allen–Bradley Co.,* 801 F.2d 859, 863 (6th Cir. 1986)). Further, "summary judgment will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248.

The necessary inquiry for this Court in determining whether summary judgment is appropriate is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden,* 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson,* 477 U.S. at 251–52). In evaluating such a motion, the evidence must be viewed in the light most favorable to the nonmoving party. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962). The mere existence of a scintilla of evidence in support of the opposing party's position will be insufficient; there must be evidence on which the jury could reasonably find for the opposing party. *See Anderson,* 477 U.S. at 251; *Copeland v. Machulis,* 57 F.3d 476, 479 (6th Cir. 1995). Where, however, "there is 'a videotape capturing the events in question,' the court must 'view[] the facts in the light depicted by the videotape.'" *Green v. Throckmorton*, 681 F.3d 853, 859 (6th Cir. 2012).

With regard to affidavits, Rule 56 (e) requires that affidavits submitted in support of, or in opposition to motions for summary judgment include facts based on personal knowledge, and that personal knowledge "must be evident from the affidavit." *Reddy v. Good Samaritan Hosp. & Health Ctr.*, 137 F.Supp.2d 948, 956 (S.D. Ohio 2000). Affidavits at the summary judgment

7

stage also may not rely upon inadmissible hearsay because inadmissible hearsay "cannot create a genuine issue of material fact." *North American Specialty Ins. Co. v. Myers*, 111 F.3d 1273, 83 (6th Cir. 1997). Self-serving affidavits, alone, are not enough to create an issue of fact sufficient to survive summary judgment. *Wolfe v. Vill. of Brice, Ohio*, 37 F.Supp.2d 1021, 1026 (S.D. Ohio 1999). See *Anderson*, 477 U.S. at 251; *Copeland*, 57 F.3d 476 at 479.

## IV. LAW AND ANALYSIS

### A. Section 1983 Excessive Force in Violation of the Fourth Amendment

Plaintiff's first cause of action, pursuant to 42 U.S.C. § 1983, alleges that Defendants used excessive force in the killing of Abram Bynum, thus violating his rights under the Fourth Amendment. Plaintiff brings this claim against all Defendants, but the liability of the individual Defendants is analyzed separately from the liability of the municipal Defendant.

### 1. Liability of Individual Defendant Police Officers

Plaintiff has brought suit against each of the six officers who discharged their firearms at Abram Bynum. The parties do not dispute the legal standard for a § 1983 claim of excessive force in the Sixth Circuit. In moving for summary judgment, however, Defendants argue that they have qualified immunity to Plaintiff's § 1983 claim. Qualified immunity is not a defense to all constitutional claims. The Supreme Court, in *Saucier v. Katz*, 533 U.S.194 (2001), established a two-part test to determine whether a defendant is entitled to qualified immunity:

> First, a court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right. Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was "clearly established" at the time of defendant's alleged misconduct.

*Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (internal citations omitted). In *Pearson*, the Court revised the *Saucier* test so that district courts may "exercise their sound discretion in

deciding which of the two prongs of the qualified immunity analysis should be addressed first." *Id.* at 236.

### a. Clearly Established Constitutional Right

Here it is appropriate to first address the second prong. Plaintiff argues that since Abram Bynum was immobilized and not resisting arrest when Defendants fired on him, deadly force was not necessary to subdue him and was, thus, excessive. If the facts are susceptible to Plaintiff's characterization, an issue addressed by the first prong of *Saucier*, it is clear "that a suspect's right to be free from the use of excessive force is clearly established." *Floyd v. City of Detroit*, 518 F.3d 398, 407. The Sixth Circuit has also held that "the right to be free from physical force when one is not resisting the police is a clearly established right." *Kijowski v. City of Niles*, 372 Fed.Appx. 595, 601 (6th Cir. 2010), *quoting Wysong v. City of Heath*, 260 Fed.Appx. 848, 860 (6th Cir. 2008). Moreover, common sense informs us that if, as Plaintiff alleges, an injured and immobilized suspect is trapped in a totaled vehicle without a weapon, two volleys of fire numbering 80 bullets exceed the force required to subdue him. Hence, the Court finds that if Plaintiff has adduced evidence to support her characterization of events, Abram Bynum's clearly established Fourth Amendment right to be free from unreasonable seizure was violated. The question then becomes whether there is evidence in the record which demonstrates such a violation.

### b. Violation of the Clearly Established Constitutional Right

Claims that "law enforcement officials used excessive force in the course of making an arrest" or other seizure of a person "are properly analyzed under the Fourth Amendment's 'objective reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 388 (1989). In applying this test, a district court examines the "totality of circumstances" in the particular case,

"including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. at 396.  In a use of force situation, objective reasonableness must be analyzed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Simmonds v. Genesee County*, 682 F.3d 438, 444 (6th Cir. 2012), *quoting Kostrzewa v. City of Troy*, 247 F.3d 633, 639 (6th Cir. 2001).  A reasonable belief "could also be a mistaken belief," which "would not undermine its reasonableness as considered at the time of the acts." *Davenport v. Causey*, 521 F.3d 544, 552 (6th Cir. 2008).  Whether a law enforcement official employed "the best" method of effecting a suspect's seizure is not relevant to the constitutional analysis because "the Fourth Amendment does not require officers to use the best technique available as long as their method is reasonable under the circumstances." *Id*., *quoting Dickerson v. McClellan*, 101 F.3d 1151, 1160 (6th Cir. 1996).

While the Court does not eagerly second guess the judgment of law enforcement officers attempting to prevent the flight of a suspected serial rapist, the totality of circumstances in this case presents genuine issues of material fact as to Defendants' objective reasonableness.  First, there is no question that "the severity of the crime at issue," multiple rapes, could scarcely be higher.  Nor was Abram Bynum an ordinary suspect.  The Los Angeles Sheriff's Department Crime Lab identified Bynum's DNA profile as a match in five separate rape cases.  Extensive measures were warranted to prevent his flight.  There is also no dispute that Abram Bynum had fled in an automobile at high speeds, endangering the lives of officers and bystanders in the process.  While there is no evidence that Abram Bynum left his brother's apartment with the intention to flee, once he saw he was being pursued by police, he attempted to evade his pursuers.  Abram Bynum ran multiple stop signs while being pursued by Cruiser #91 and

eventually ended up driving eastbound in the westbound lanes of Interstate 70.  Witness accounts suggest he may have purposefully caused the head-on collision with the semi-truck.  This demonstrates that he not only was fleeing, but also was a danger to the safety of officers and others.  While Plaintiff criticizes the pursuit tactics employed by Defendants, the pursuit does not form the basis of Plaintiff's § 1983 claim.  The problem for Defendants is that the use of allegedly excessive force only occurred after the pursuit and collision, by which time circumstances had changed dramatically.

After the collision, Abram Bynum was no longer fleeing.  His vehicle was immobilized, as Defendants admit.  There was no possibility of escape; half a dozen police officers surrounded Abram Bynum.  In fact, after the shooting, Defendants discovered that the doors of Abram Bynum's vehicle were too damaged to be opened.  Furthermore, Abram Bynum was palpably injured.  The Autopsy Report records that, prior to the shooting, Abram Bynum had sustained, *inter alia*, a fractured clavicle, a fractured sternum, multiple rib fractures, and abrasions to the face.  According to Defendant Amstutz, Abram Bynum appeared to be unconscious following the collision.  Nevertheless, Defendants contend they were objectively reasonable both in perceiving that Abram Bynum remained a danger to them and in discharging their weapons at him to eliminate the danger.

Defendants cite a number of reasons they had for believing Abram Bynum was a danger. First, the pursuing officers had been informed over the radio, erroneously it was later discovered, that Abram Bynum possessed a permit to carry a concealed weapon.  Defendants contend that the fact the report that Abram Bynum had a concealed carry permit was incorrect does not detract from the reasonability of their belief he was armed.  Defendants conflate, however, the question of whether Abram Bynum possessed a concealed carry permit with the question of

11

whether he was armed. Defendants have not cited any law for the proposition that solely because an individual has a concealed carry permit, police officers may *presume* he is armed. Indeed, the Court does not find that it is objectively reasonable, as a matter of law, to presume that a person who has a permit to carry a concealed weapon is armed at a particular moment. Certainly, that a suspect may be armed is a possibility of which law enforcement officials should be aware, but not something they should take for granted based solely on the existence of a permit.

Second, Defendants contend that their belief Abram Bynum was still resisting arrest after the collision was reasonable based on the fact that he was non-compliant with their commands to, among other things, show his hands. Again, the totality of circumstances undercuts Defendants' assertion that Abram Bynum was resisting arrest. Abram Bynum had just been involved in, by all accounts, a dramatic collision in which he sustained serious injuries. Such an experience would be disorienting in the extreme. A jury could find Defendants were not objectively reasonable in believing Abram Bynum's disoriented non-compliance to be resistance to arrest, or an attempt to locate a firearm. Moreover, the officers all agreed that Abram Bynum did show them his hands, albeit not in the manner they anticipated. In fact, according to their testimony, he showed them his hands multiple times. Defendants claim they misperceived the gesture to be Abram Bynum pointing a weapon, though it is now known Abram Bynum was unarmed. The Court also observes that though Defendant O'Donnell has stated he believed Abram Bynum was holding a dark object when showing his hands, Defendants failed to identify any such object in the wreckage of the Cadillac.

Third, Defendants contend they were reasonable in firing on Abram Bynum after he moved inside the vehicle, appeared to be reaching downward, and then raised his hands together,

"cupped," as Defendants have described.[1]  While this Court gives deference to the law enforcement officials' judgment in the moment, and avoid post hoc second-guessing, neither this Court nor a jury needs to accept wholly Defendants' self-serving rationalizations stated long after the incident occurred.  Moreover, Plaintiff has adduced evidence, in the form of opinion testimony from a retired Illinois State Trooper that Defendants were not reasonable in responding to Abram Bynum's movement by firing two volleys, comprising 80 bullets.  This is particularly true given that Defendants instructed Abram Bynum to show his hands and when he did, they shot him because he had moved his hands in a manner they perceived as threatening.  Not all the officers who were near the car fired, and two officers who fired in the first volley did not fire in the second volley.  This suggests that not all the officers present concurred that Abram Bynum's gesture constituted a threat.

    A jury can also view Cruiser #91's video of the incident and compare it with the testimony of the officers present to determine whether the officers' testimony is credible.  Defendants Estepp and Kinney even had their heads inside the vehicle while trying to open it.  They did not exhibit any concerns for their safety at that time or see anything resembling a weapon.  Defendants contend the Plaintiff has not adduced evidence to support her characterization of the facts, but Defendants' evidence itself is susceptible to Plaintiff's characterization.  The scene, as presented by the Cruiser #91 video, is chaotic.  The officers casually stroll around the vehicle and try to open it before jumping and moving back, presumably in response to Abram Bynum moving when they had previously thought him unconscious.  The

---

[1] Plaintiff alleges Abram Bynum was "pinned" by the airbag and held immobile.  That is contradicted by the testimony of all Defendants and Defendant's opinion witness who testifies that airbags deflate within seconds of deploying.  Plaintiff has adduced no evidence to the contrary.  Moreover, Plaintiff has adduced no evidence to support her allegation that Abram Bynum could not raise his arms after the collision; the Autopsy Report contradicts that assertion.

jury may determine the officers fired in surprised panic or in response to other officers firing, rather than in response any real or imagined threat from Abram Bynum.

Fourth, even if a jury were to find that firing the first volley was objectively reasonable, it could find that firing the second volley was not. Defendants claim that after the first volley Abram Bynum made a similar, though less dramatic, movement with his arms. In response to this, six different officers opened fire on Abram Bynum, ultimately firing 80 rounds and striking Abram Bynum 23 times. Plaintiff's opinion witness and the Cruiser #91 video, could allow a jury to find it was not objectively reasonable for Defendants to consider Abram Bynum a danger when they fired the second volley. Moreover the statements of Defendants vary in small, but potentially significant, ways. Defendants Amstutz and W. Edwards, for instance, fired in the second volley without knowing who had fired in the first volley, or if Abram Bynum had fired at all. At the same time Defendants O'Donnell and Estepp did not fire in the second volley despite remaining in the same positions near the Cadillac. Defendants also describe the movements purportedly made by Abram Bynum in different ways. A jury may find it significant that some officers believed he was reaching for his rear waistband, while others only mention him reaching on the floor.

In considering summary judgment in use of force cases, the Sixth Circuit holds that "if 'the legal question of immunity is completely dependent upon which view of the facts is accepted by the jury,' the district court should not grant immunity from a deadly force claim. 'Summary judgment is in appropriate where there are contentious factual disputes over the reasonableness of the use of deadly force.'" *Murray-Ruhl v. Passinault*, 246 F.Appx. 338, 343 (6th Cir. 2007) (internal citations omitted). In the aggregate, the issues discussed above present a genuine issue of material fact as to whether Defendants' actions were objectively reasonable. A


jury, having viewed the video and heard the testimony of Plaintiff's witnesses, could find that Defendants' shooting of Abram Bynum was not objectively reasonable in the totality of circumstances. He could no longer flee, was unarmed, and was seriously injured. A jury may find it was not objectively reasonable for Defendants to believe Abram Bynum posed a danger which necessitated the use of deadly force. If Defendants were not objectively reasonable, they would not be entitled to qualified immunity for having violated Abram Bynum's Fourth Amendment rights.

At oral argument, Defendants' counsel suggested that *Chappell v. City of Cleveland* controls the outcome of this case. 585 F.3d 901 (6th Cir. 2009). Defendant officers in *Chappell* did receive immunity after using deadly force, but in vastly different circumstances. The officers in *Chappell* were in a dark room and the suspect they shot was moving quickly towards them, armed with a knife. *Id*. at 905. Their reasonableness in shooting the suspect has no bearing on Abram Bynum's situation, where the suspect sat severely injured and trapped in a totaled vehicle, with no weapon to hand.

For these reasons, individual Defendants' Motion for Summary Judgment on Plaintiff's § 1983 claim is **DENIED**.

### 2. Liability of Defendant City of Columbus

Plaintiff has also brought a claim of excessive force in violation of the Fourth Amendment, pursuant to 42 U.S.C. § 1983, against the municipal Defendant. A municipality is liable under § 1983 only if the municipality itself caused a plaintiff's constitutional injury. *Monell v. Department of Social Services*, 436 U.S. 658 (1978). For a claim to lie against the municipality for the actions of its employees, plaintiff must allege a violation which results from a "governmental policy or custom." *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989). In the

Sixth Circuit, "to satisfy the *Monell* requirements, a plaintiff must identify the policy [or custom], connect the policy to the [governmental entity] itself and show that the particular injury was incurred because of the execution of that policy." *Garner v. Memphis Police Dept.*, 8 F.3d 358, 364 (6th Cir. 1993).

Defendant argues that it is entitled to summary judgment because: (1) Plaintiff has failed to establish a violation of Abram Bynum's constitutional rights; and (2) Plaintiff has failed to identify a specific custom, policy, or practice of Defendant which resulted in a constitutional injury to Abram Bynum. Defendant's first argument is unavailing because, as the Court explained above, a jury could reasonably find the individual Defendants did violate Abram Bynum's Fourth Amendment rights. Second, Plaintiff has identified one policy which could be found to have caused Abram Bynum's alleged Fourth Amendment deprivation. The policy Plaintiff identifies is that of authorizing the use of deadly force against a suspect "based upon merely alleged failure to follow commands, when no weapon has been observed." *Plaintiff's Response*, Doc. 55 at 35. The Court understands Plaintiff to be arguing that if the use of deadly force did violate Abram Bynum's constitutional rights and the use of force is in compliance with the CPD's policy, as found by the internal investigation, that would indicate CPD's policy does not comply with the Constitution. Plaintiff has, thus, identified a policy of Defendant which allegedly caused Abram Bynum to be deprived of his Fourth Amendment rights.

For these reasons, the municipal Defendant's Motion for Summary Judgment on Plaintiff's § 1983 claim is **DENIED**.

### B. Ohio Assault and Battery

In the Complaint, Plaintiff stated a claim for "Assault and Battery" as the second cause of action. Aside from realleging the allegations already stated, Plaintiff added only "[t]he defendants intentionally and maliciously applied and threatened to apply unlawful and

16

unnecessary force against Abram Bynum." *Complaint*, Doc. 2 at 14. Defendants correctly state that under Ohio law, an action in tort for assault and battery "shall be brought within one year after the cause of the action accrues." O.R.C. § 2305.111. The incident resulting in this action occurred on July 7, 2009. The action was filed on April 4, 2011, more than one year later. In Plaintiff's Response, she argues that in stating a claim for "Assault and Battery" and alleging intentional and malicious use of force she was actually stating a "negligence claim." *Response*, Doc. 55 at 37. Plaintiff's argument is contrary to all her relevant statements in the Complaint; it has no support. Plaintiff may not raise a claim of negligence for the first time in her opposition to summary judgment.

For these reasons, Defendants' Motion for Summary Judgment on Plaintiff's Second Cause of Action for Assault and Battery is **GRANTED**. The claim is, hereby, **DISMISSED**.

### C. Ohio Loss of Consortium

Plaintiff's third cause of action alleges Loss of Consortium for the death of her son. Although § 1983 itself does not support a cause of action for loss of consortium, such a claim may be brought pendent to a § 1983 suit where state law recognizes loss of consortium as an independent cause of action. *Kinzer v. Metropolitan Government of Nashville*, 451 F.Supp.2d 931, 946-47 (M.D. Tenn. 2006). The question here is whether Ohio law supports a cause of action for a parent's loss of an adult child.

In the only reported case in which an Ohio Appeals Court necessarily addressed that question, it held that "in Ohio, there is no loss of consortium of an adult child [in an action brought by a parent]." *Cole v. Broomsticks, Inc.*, 669 N.E.2d 253, 256 (Ohio.App.1st 1995). This Court has previously cited the *Cole* decision for the proposition that Ohio does not recognize a parent's loss of consortium of an adult child. *Bauer v. City of Cincinnati*, 2011 WL

5042069, at *13 (S.D. Ohio Oct. 24, 2011). The Court now finds no reason to depart from the established law of the State of Ohio.

For these reasons, Defendants' Motion for Summary Judgment on Plaintiff's Third Cause of Action for Loss of Consortium is **GRANTED**. The claim is, hereby, **DISMISSED**.

### D. Ohio Wrongful Death

Plaintiff's Fourth Cause of Action is for wrongful death under Ohio law. Plaintiff clarifies in her Response that she brings this claim against only the individual Defendants, not the municipal Defendant. *Response*, Doc. 55 at 38. Generally under Ohio law, an employee of a political subdivision "is immune from liability unless," *inter alia*, "[t]he employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner." O.R.C. § 2744.03(A)(6)(b).[2] The Supreme Court of Ohio has held that "the issue of wanton [or reckless] misconduct is normally a jury question." *Fabrey v. McDonald Village Police Dept.*, 639 N.E.2d 31, 35 (Ohio 1994). In that decision, the Supreme Court also adopted the following reckless standard: "The actor's conduct is in reckless disregard of the safety of others if such risk is substantially greater than that which is necessary to make his conduct negligent." *Id*. (internal citations omitted).

Defendants' counterarguments consist of the conclusory statements that the decision "to use deadly force was objectively reasonable" and "no rational trier of fact could conclude they acted wantonly or recklessly." *Motion*, Doc. 33 at 45. Defendants appear to rely on the Court accepting their previous assertion that the use of force was "objectively reasonable" as a matter of law. As stated above, the Court does not find Defendant's use of force was objectively reasonable as a matter of law. There is a disputed issue of fact as to whether the use of force was

---

[2] Section 2744.03(A)(6) provides two other exceptions to the general presumption of immunity. Plaintiff has not argued either of the other exceptions applies and the Court finds they do not.

18

reasonable in the totality of circumstances. Just as a jury could reasonably find the use of force was not objectively reasonable, a jury could also find the use of force was reckless. The deposition testimony of Plaintiff's opinion witness, Ronald Janota, retired Illinois State Trooper, together with Defendants' admission that the erroneous statement that Abram Bynum had a concealed carry permit was their only information as to whether Abram Bynum was armed, could lead a jury to reasonably conclude Defendants had acted recklessly in opening fire on an injured suspect in an immobilized vehicle. Defendants have failed to satisfy their burden to show there is no genuine dispute of material fact as to their alleged recklessness.

For these reasons, Defendants' Motion for Summary Judgment on Plaintiff's Fourth Cause of Action for Wrongful Death is **DENIED**.

## V. CONCLUSION

For the reasons stated above, Plaintiff has raised disputed issues of material fact with respect to her first, third and fourth claims against Defendants. Thus, the Motion for Summary Judgment is hereby **DENIED** with respect to those claims. Plaintiff has failed, however, to raise a disputed issue of material fact with regard to her second claim, for tortious assault and battery. That claim was not timely filed, so Defendants' Motion for Summary Judgment is **GRANTED** with respect to Plaintiff's third claim.

**IT IS SO ORDERED.**

            s/ Algenon L. Marbley
           **ALGENON L. MARBLEY**
           **UNITED STATES DISTRICT JUDGE**

**DATED: August 30, 2013**